Good morning Your Honors. My name is David Wedby. I along with Tim Ford represent Ali Dualeh and his family as the plaintiff appellants in this matter. Now this case raises core principles that are pitted against modern police practices. And these practices are based on expediency. And the expediency involved here is that the officers wanted to get into this home, the Dualeh home, as soon as possible without and surprise them. That's the whole point of their approach. Now I'm going to address three issues or there are three issues before the court but I'd like to focus on the Rule 50 issue here and ask this court to find as a matter of law that when the officers were approaching the Dualeh home on the day that the search warrant was served and that they were allegedly seen from somebody in the upstairs window that that is not enough to trigger extra circumstances so as to excuse compliance with the Knock and Announce Rule. Under the Fourth Amendment, the framers struck a balance between the interests of privacy and personal security on the one hand and law enforcement on the other hand. Now the Knock and Announce Rule requires that police officers knock so that the people inside can know they're out there, announce their purpose, in this case a search warrant, and then wait a reasonable amount of time before they may forcibly enter the home. Now I'd like to just interject right at that point because as you know I was involved in the banks back and forth and in that case ultimately Justice Souter wrote the opinion in banks and going back to review it I was struck by in balancing that you just talked about he went back to the whole concept of what's at stake under the Knock and Announce and seemed to treat it as essentially the protection of the homeowner's ability to have the time to open the door so that the officers didn't break down the door and then he went on at some length on analyzing the amount of time which in that case was approximately 15 seconds and wrote fairly extensively about the concept in drug cases of the destruction of evidence and I was struck by the balance he was drawing there. Now a lot of the argument in this case is focused on officer safety there's some discussion about destruction of evidence but it got me to thinking about what's at stake in this case and in this case my question in light of what the bank's Supreme Court decision says is this case about the opportunity of Diwali to open the door and avoid his door being broken down? Is that what it comes down to? Because they did have a warrant to go in and if they had knocked and announced under Justice Souter's opinion the fact it was drugs would have influenced the amount of time and banks itself was 15 seconds. So I'm just asking you to focus on that as you make your argument. Yes, Your Honor. Thank you. That's exactly the point. In this case, well this case is about the fact that regardless of how much time the officers ultimately wait before they breach a door, they have to give the homeowners notice that they are outside and a reason that they are there. Then the clock starts to tick. So if they were seen that would give the notice but it doesn't give a reason. That's exactly right, Your Honor. And to finish with Judge Fisher's question, so the fact that these officers were seen at, it was argued, 40 yards from the door and perhaps 30 seconds elapsed or something like that, that is perfectly fine and that might have served to shorten the reasonable amount of time that they would have waited after they gave the knock and announce. But it does not absolve the officers of their affirmative duty under the Fourth Amendment to give the knock and announce because it makes sense. There's no way for the homeowners to know what's going on out there. I mean, picture the scene. You have these officers that are coming across the parking lot. It's a multi-unit complex. They don't know, the person might not know whether they're going to the neighbor's door, to this door, to this door. Now when the knock comes, of course you wake up. It's for us. Then we go down and answer the door. But until that moment, we can't know. Counsel, I happen to be the district court judge in United States v. Banks so I have something to say. I didn't want to say that. Well, so I was reversed by my colleagues, my present colleagues. No, I upheld you. Never mind. I wasn't on the case. I'll take the blame wherever it goes. I think I was reversed initially and then the Supreme Court reversed the Ninth Circuit. So I can't remember. That would be a shocking result. But anyways, I started the ball rolling on that case. But I wanted to ask you, I was struck by your statement that the knock and announce is a requirement. And I wanted to ask you, in United States v. Combs, we seem to say that knock and announce is the preferred method but it's not always required. So how do you reconcile your view of the knock and announce concept with that statement in Combs? Well, I think it's very important to look at the facts of Combs, Judge Rawlinson, because in that case, there had been officers that were assembled in the area right in front of the house where the warrant was to be served. There were several vehicles, I believe, all of which had overhead lights that were going. There was an officer with a bullhorn announcing, police, search warrant, open up. And at the same time, I believe that there were officers going towards the door and that there was then someone who skidded away. And so in that case, the function of the knock and announce, which is to alert the homeowners to the presence of the police officers and their purpose, had taken place via the bullhorn and the overhead lights. How would they know that the bullhorn was for one particular house as opposed to another house? Going with your analogy that they wouldn't necessarily know, just because there's a bullhorn, does that necessarily mean that the targeted house would know that it's there for them if the announcement is made throughout the neighborhood? Well, I think that would depend whether the police officers were directly in front of the house as they were in Combs or whether they were some distance away sort of making a general announcement to the apartment complex. I don't think there was any question in Combs that the bullhorn was directed at the house and had something similar taken place here. Then certainly the fact that the knock and announce requirement might have been taken care of based on the other factors that would have served to alert the Duales if the police officers were out there serving a search warrant. In the briefing by the defendants, they suggest that the person up in the window, whomever that was, would have been alerted to the fact of there were police coming toward, apparently across this open parking lot, toward the unit that the observer was in. Is that correct, that part? That is correct, Your Honor. Okay. So the observer would have known that the police were headed toward that unit. Do we know how many units were involved? They do talk about, that is the defendants talk about, they had to come up, secure the first floor of the units, and then get up to the second so that whoever was upstairs knew that the police were coming in their direction and were coming up the stairs toward them. Do we know enough about the layout to say they certainly had constructive knowledge they were coming after the Duales unit? Well, if I understand your question correctly, Your Honor, there was no two levels to I'm just quoting what was in the brief. They said they secured the first floor and then they went up to the second floor. The Duales occupied two floors of the same apartment. And so when they came in, the defense testimony was that they saw somebody upstairs. Before they came in? After they came in. When they broke the door down, then they looked up and saw somebody at the top of the stairs. So is there representation that they didn't see anyone upstairs before they broke the door down? No. They claim, based on very flimsy evidence, that they did see somebody in the upstairs window. Now, the officers couldn't explain whether this was a man or a woman, a child or an adult. They couldn't even tell you what window it was. In fact, the most important aspect, I think, is that there was no officer that actually came forward and said, I called out compromise. So that's a bit flimsy. But for purposes of Rule 50, I understand that we have to assume that whoever it was that the officers believed was in the upstairs window, that they saw somebody. And even the fact that they were wearing police, you can assume that they knew that they were police. But there's no evidence in the record to suggest that the Duales knew why the officers were there. So what you have here is the Ninth Circuit requires there be some particular indication of officer threat or evidence destruction. Here there was no weapon or history of violence noted in any of the pre-raid investigation. There was no – the officers testified that they didn't see any movement. It was just a static person. There was no fluttering. There was no person running away. There was no person with a cell phone to his head. There was no gun trained on the officers. There was no barricaded door. There were no other factors that this Court has recognized as giving rise to the extra-circumstance exception to the knock-and-announce rule. They've argued that there was. They've argued that the warrant was for a drug trafficking cartel or whatever operation that was feeding money from the proceeds to a terrorist organization. Was that in the warrant application? I don't believe that there was anything about funding to terrorist organizations. Okay. Well, I'd like to hear it. That's why I wanted to ask you. And then the second aspect was – that's why I was raising Justice Souter's point. In his opinion, he talks about drugs being inherently disposable. And I noticed the defendants are arguing, well, there's evidence that cat is the kind of thing that can be readily disposed of and, therefore, knowing that they were going after this kind of stuff, they could reasonably infer that as soon as somebody was aware they were coming, they would have the opportunity to destroy the evidence. Let me take your first point first in dealing with the conspiracy issue. The showing of extra-circumstances requires that there be some facts that weren't known at the time of the warrant application. This is, in fact, what the jury instruction said. Now, the fact that it was a conspiracy that involved 17 different warrants that were to be served that day, the fact that these – I'm not talking about the multiplication. I'm talking about danger, safety, which they rely on, the terrorism thing. That's all I'm focused on. The testimony was that there was no knowledge of any terrorism going at all, and the officers were just arranged to come that morning. And as Commander Leitman, who was the field sergeant in this case, said, this was a very low-risk warrant. There was no unusual factors. The only mechanism that made this into any sort of arguable ecstasy was the fact that they were seen from a window. And I'd like to reserve the rest of my time, but our argument is that that is insufficient under the Fourth Amendment. Thank you, Counsel. You have some time remaining, about two and a half minutes. Thank you. Good morning, Your Honors, and may it please the Court. My name is Rebecca Cohen, Assistant United States Attorney, and I'm here on behalf of DEA Special Agent Thomas Phillips. And as you know, Your Honors, Special Agent Phillips was behind the Duale's apartment at all times during the entry that was performed by the municipal defendants. He couldn't see what was going on and had no involvement into the entry itself. Given that the only issue with respect to Special Agent Phillips is whether he was an integral participant into the entry and that Mr. Wedby did not address this issue in his comments before the Court, I'm happy to answer any questions the Court might have. But otherwise, I'll submit our issue on the briefs and leave the remaining time for Mr. Clement. Does his report after the fact, which turned out to have exaggerated, as I understand it, does that make any difference to whether he was an integral part of what happened on the ground? Does it raise an inference? I don't think it does, Your Honor. And just to clarify factually, I don't think it exaggerated anything. Although it did turn out to present inaccurate information, it was based on the information he believed to be true at the time, which was based solely on what he heard. He couldn't see what happened, and so when he reviewed the report and submitted it for – he didn't actually write it, but he reviewed it, approved it. When he did that, he was saying only that that's what he thought was true. It did turn out to be inaccurate. But I don't think it raises any inference at all for two reasons. One, the only information submitted to the court on that point was the declaration and testimony by Special Agent Phillips himself that explained exactly what I just said, that he put in the report what he heard only that turned out to be wrong. There was no information to the contrary presented that would allow any other inference. And, in fact, although I think now there's inferences of kind of a cover-up, that type of thing, that was not even alleged at the time. And the other thing is an inference just doesn't make sense. If what he was doing was trying to cover up what the municipal defendants did by not giving a knock-and-announce, then I think it's logical to assume that they would try to present the same story, yet the municipal defendants have never alleged that they did give a knock-and-announce, so he's actually making it more confusing by having inaccurate information in there that there was a knock-and-announce when, in fact, the municipal defendants who performed the entry never alleged at any time that they had given a knock-and-announce. And my last point on that issue, Your Honors, would just be that even if you could somehow infer some type of after-the-fact cover-up on the knock-and-announce issue, that doesn't make him an integral participant in the entry itself. That would be something that happened. He was part of the planning, though, right? He was not part of the planning into the entry. The only evidence submitted to the district court was that although he participated in a pre-search meeting, he had no control and no discussion, no involvement at all into the entry itself. That was performed solely by the VNet and the municipal officers. He had no part in that, no reason to know beforehand how they would perform if a compromise was called, and obviously didn't even know at the time that a compromise ever was called. He was in back of the apartment, couldn't see what was happening, and had no reason to believe that the municipal defendants would act one way or another if compromised. I'm happy to answer any other questions. Otherwise, I'll defer to Mr. Klumber. I don't think we have any others. Thank you. Thank you. Good morning. Jeremy Klumber for the municipal. Could you speak a little louder, please? Jeremy Klumber for the municipal defendants. The first issue is sort of the importance or the level to which the requirement of knock and announce needs to be raised here. While it is an important part of the Fourth Amendment jurisprudence, it does need to be recognized that it's just one of the sub-factors that we use to determine whether, overall, the actions were reasonable. And there's also a statutory requirement, right? There is a statutory requirement. There's some question as to whether that applies to municipal officers if they're acting in a federal capacity. But in general, the cases that have talked about the reasonableness under the Fourth Amendment generally track what the statute, what 18 U.S.C. 3109 says. So I'm not sure that it's incredibly relevant whether we go by the statute or just by the cases themselves. But the cases have held that the knock and announce requirement is an element of the reasonableness requirement. And the Supreme Court has recognized that it comes from the common law back in England, that the king can break down anyone's door any time he wants. So, again, while it's important... It's not a minor... It's not minor, no. But there's this sense from the plaintiff's briefing that this is some sort of separate constitutional requirement to knock and announce. And it's not. Knock and announce is a general rule that they say, absent other circumstances, we need to knock and announce. Well, they have to be exigent circumstances. They do have to be exigent circumstances. And you didn't seek a no-knock warrant? No, not at all. Okay. So at the time that the warrant was sought, if you had all these concerns, the defendants had all of these concerns about terrorism and destruction of drugs, they knew that in advance. So why didn't they ask the issuing magistrate judge to authorize a no-knock? Well, just for clarification, it was the DEA who asked for it. The municipal officers were assembled just to serve the warrant because there were so many warrants being served that, in fact, every DEA agent on the West Coast was busy serving warrants that day, so they sort of pulled in all these municipal officers who had worked with them before. So the municipal officers didn't have the ability to seek a no-knock warrant because the warrant was sought by a different group than those who actually executed the warrant? That's correct. But I don't want to give the impression that perhaps the municipal officers thought it should have been a no-knock warrant. The reason why these particular fears became elevated at the time is solely because of the compromise. Everything seems to rise or fall on seeing a person appear in the second-floor window. I think it's fair to say that without the compromise. Well, is that what you're referring to by compromise? Absolutely. Okay. So does this mean that every time someone executes a warrant and they see the homeowner peer through the curtains or the child of the homeowner or the gardener or whoever is inside the house, that that justifies a no-knock entry? And if not, how could you possibly create a line between that generality and this one? Well, the problem arises when we try to create lines. The cases have been clear that these are fact-specific inquiries. Well, but the only thing you're – maybe I made the question too long, but the facts in my hypothetical are just like the facts here. You have a normal warrant that requires knock and announce, and the homeowner peers through the curtains and the police notice that. Is that an exigent circumstance? Not all the time. It depends on the homeowner. What makes it exigent here? A whole variety of separate circumstances that we have to take all together. For example, the officers – For how far away they were, whether they had cover. Exactly right. How the building set up was, whether they – Counsel, that's why I was asking. Now, you're saying, well, the municipal defendants didn't seek the warrant. The warrant authorized and could have authorized a – did not authorize a no-knock. If they're – all of the factors that are cited in your brief, was terrorism ever mentioned in the – Yes, yes. Excuse me, I haven't finished my question. Was terror mentioned in the affidavit that went to the – I'm not sure if it was mentioned. The affidavit, because of the hugeness of the investigation, the affidavits and the reports are dozens and dozens and dozens of pages for all the 18 different warrants. I don't know if the word terror was used or not. The municipal defendants testified at the warrant briefing the day before that the DEA agent who was coordinating the municipal defendants explained what this was, that it was a terrorism investigation or it was a nationwide importation of drugs that was used to fund terrorism in the Horn of Africa. I have the – Okay, well, let's accept that. I'd like to come back to then what your answer is to Judge Graber's question, because essentially the pattern here or the scenario here is the people who sought the warrant would authorize what the municipal defendants were deputized to do. Whether they sought the warrant or not, that was the limit of what the federal warrant allowed. Okay, and so since it did not authorize a no-knock, now what you're saying is because somebody was up in the window that that suddenly turned it into a no-knock warrant. But when you start talking about lack of cover in the parking lot, if you're going toward, as your briefs do, to destruction of evidence, every bit of that was or should have been known when they sought the warrant. Sure. And so the problem is we then come back to what Judge Graber is positing. You go to a magistrate judge, you get a no-knock warrant, and then all you have to do is see a curtain move and somebody thinks, oops, you know, compromise, bam, in through the door they go. And whatever you may think about the merits or status of the privacy of entry into the homeowner's home, as I said, Justice Souter dealt a great length of that on that interest in the banks case. So that's what is troubling about this case. It seems I'm sympathetic to what you're saying, but I'm also sympathetic to the homeowner who is, you know, they're victimized by this. Well, this is a highly fact-specific driven inquiry, and the cases with regard to compromise, as Mr. Wedby points out, that the officers have to have a reason to believe that the officers or that the person who sees them knows who they are, knows why they're there. If the officers think that person knows who we are, knows where we're going, and knows what we're wanting to do, that's when the announce happens. And so the issue here is what we're essentially saying is when the officers say, hey, we see someone in the window, it's clear to us they're looking at us, they know who we are, they know where we're going and what we're going to do, that's when the announce starts. Where's the testimony of the officer who called compromise who said just what you said? He's the only person who can prove and lay the foundation for how you just characterized it. That would be true if all the other officers upon hearing compromise didn't look at you. Now, wait a minute, counsel. That doesn't count in my book. What you're saying is a no-knock warrant can be converted to an exigent circumstance because the person who called compromise is satisfied that the person sees who is coming, that they are going to the unit, and that they understand the purpose. Now, you don't have any evidence that that motivated or was the fact that confronted the officer who called compromise. Sure, when somebody calls it, the other officers are acting in response to that, but they are not percipient witnesses. Well, the other officers did testify as to what they saw when they looked up in the window and that they came to the exact same conclusion. On page 35 of my brief, this is trial testimony, asking one officer, was there any doubt in your mind at that time that a person looking out the window could see the entire team approaching? Answered, there's no doubt in my mind. That's not responsive. He didn't say he saw the person. He did say he saw the person. Not in that quoted statement. Okay, we'll go to the next one on the bottom of page 35. Was there any doubt in your mind that the person in the window saw the team approaching? Answered, there's no doubt in my mind. Where's the foundation that he actually saw? Where's the foundation for the testimony that he saw? It's not quoted in here, but it's quoted in the – it's throughout the brief. Several of them said. Well, I've read your brief, and that's why I'm pressing you, because I saw a lot of your statements in the brief, and I kept looking for the backup on it, and they were a little bit elusive. Let me go to the facts. Well, at the supplemental excerpts of Record 40, Detective Gray specifically said he saw the person in the window. Multiple of the detectives testified. I looked up. I saw the person looking. I concluded that they knew who we were. There was no question about that. I asked them at trial, each of them, was there any doubt in your mind? Because this is the standard that the cases lay out. Was there any doubt in your mind that that person who was looking at you knew why you were there? Every single one of them said, there's no doubt in my mind. Every one of them besides Gray said that they actually saw the person. Yes, and the problem is that it comes down to credibility, because what happened is all of the plaintiffs, excluding the very young children, testified there was nobody up there in that window. Nobody looked out. If they had come and said, hey, I looked out the window. I see a bunch of guys running across the parking lot or walking across the parking lot. I had no idea. It comes down to a credibility question, which the cases say these are fact-specific inquiries that have to be decided by the jury. Every single one of the arguments that they've made here today, every single one of the arguments they made in their briefing, they made those to the trial court, and they made those again and again and again to the jury. Why wasn't the person who actually yelled, take it Grace didn't yell? It's unclear. It has more to do with the nature of their jobs than it does any lack of memory. These guys are veteran narcotics detectives. This is not by any stretch the first or the last of these that they've done. And so they try to go back four years and say, okay, it would be like asking me, why didn't you use this different word in a brief that you wrote three years ago? Each of them said, look, we heard compromise. We looked up and we independently came to the same thing. But more importantly, the jury instructions in this case, all of them lay out these principles. They say the police have to be virtually certain as to what the person is looking out the window and seeing and concluding. Said the police have to have reasonable belief about this. They cannot have hypothetical cuts. All these things were laid out in the jury instructions. Counsel, you've exceeded your time and you may have just a few seconds to wrap up if you'd like. All of these things were explained in the jury instructions. All of these things were argued extensively. The jury decided that's the way this is supposed to work. We're supposed to present these facts to a jury and let the jury decide that's what happened. Thank you, counsel. Mr. Webby, you have a short amount of time remaining for rebuttal. To the officers in this case, compromise meant one thing. They know we are coming, which was supported by the defense police practices expert, Thomas Ovens, who said they lost the element of surprise. Now, the whole point of the knock-and-announce rule is to remove surprise from the equation unless there are other factors. There were no other factors here. Wait a minute. You know, you've got a situation where we've now heard that the officers on the ground were briefed by the DEA agents to, A, they knew there were drugs, and B, that the proceeds they believed were connected to a terrorist organization. Now, first of all, is that dispute, whether it's true or not, but is it true that the DEA briefing said that? The dispute that the DEA made any such extensive briefing on that. Okay, but the jury heard all that about these claims about what was told to the officers. I don't remember what the jury heard about the terrorist thing. There was an instruction and so on. Okay, so the officers on the ground are moving toward an apartment, and the jury heard evidence to suggest, as we now heard, that they observed police coming toward them, and the officers had both a safety concern and apparently some, arguably, some destruction of evidence. I mean, the destruction of evidence element is there because that's what they're searching for, and it's drugs. Okay, it's not a piano, as Justice Souter said. It's a disposable drug. So what are we and the jury supposed to look at in deciding whether the officers who came at the building at that point on the ground had to make a decision as to whether or not they could or should knock before they knock down the door, knock and announce before they knock down the door? Well, for the first thing, we believe this should not have gone to the jury because any sort of weighing had taken place when the knock and announce rule was set forth, and that policy decision has already been made. But what the jury did not hear was that there were any permissible specific factors that would trigger the exigent circumstance exception. There were none of that. And with respect to evidence ---- I just want to make sure I understand. Did they not have the briefing as evidence about terrorism? I think that there was actually a motion in limine excluding any evidence or testimony about terrorism. But you don't know. If the jury did hear that, would that change your argument then? No, because it contradicts exactly what all of the other officers said, that this was a low-risk warrant. If this was a terrorism, up until the moment when they say that they were compromised, up until that moment there were no other risk factors that were adduced at trial in any kind of testimony. In fact, they said exactly the opposite. They said this is a very low-risk warrant with no unusual factors. So I don't think that there would be any basis for terrorism. This was not a terrorism case. This was simply a COT case. If I could just ---- You've exceeded your time, too, but you may have a few seconds to sum up. I just want to quickly go to the question of Special Agent Phillips' participation. Judge Graber, I do think that this raises a triable inference that there was some sort of obfuscation that happened and that because there was such a ---- what was in that DEA report was exactly how it should have gone. Now, the fact that it went totally the opposite raises a fair inference of falsehood that should have been sufficient to keep Special Agent Phillips in the case. Now, this is, I'm sure, not a hypothetical you're happy to hear, but assuming that we were to conclude that there was not a constitutional violation as a matter of law, that is, that you lose on the Rule 50 argument, does it matter whether Phillips is in or out, or would that be moot? If this Court decides it's a matter of ---- if this Court affirms the jury verdict, then, and finds no problem with the jury instructions, which we did not get into today, then Special Agent Phillips would be out, but only under those circumstances.  Okay. Thank you. Thank you, Counsel. We appreciate very much the arguments of all three counsel. The case just argued is submitted, and we will be adjourned for this session. All rise.
judges: Graber, Fisher, Rawlinson